1

# Mark T. Wagner, Ph.D.
## Licensed Clinical Neuropsychologist
## Private Consulting Practice

Thomas Milligan
721 Long Point Road, Suite 401
Mt. Pleasant, SC 29464

RE: Tara and David Farque vs. Deon Deas and Tamara Gonzalez

Date: August 23, 2021

Below are my major opinions on this case and the reasoning to support these opinions.

**Introduction**: Tom Milligan contacted me to review the above case. I have reviewed the records and summarized some of the important points upon which I have based my opinions on this case. If new information becomes available, and/or if I am afforded the opportunity to examine Ms. Farque, I reserve the right to amend my opinions. I did discuss examining Ms. Farque with Attorney Milligan in the context of an IME, but do not believe it is necessary, would be burdensome to her, and would most probably not generate any new information that might influence my opinions as the exam I would perform would not be appreciably different than Dr. Wymer's examination. Briefly, my opinions on this case surround Ms. Faque having been involved in a minor motor vehicle accident and alleging a traumatic brain injury.

## REVIEW OF MEDICAL RECORDS

### Review of medical records pre-accident

There were a handful of pre-accident medical records to review. Many of these records came from the VA healthcare system. A summary of the major diagnoses spans two pages, with diagnoses listed on Bates number 0002. One of the earliest records involved treatment for kidney stones; and within those records, of relevance, was an MRI screening questionnaire in which the plaintiff endorsed symptoms of claustrophobia as an item that would potentially interfere with the MRI procedure. Other items that stood out included a CT of the head performed on 1/6/2005 with the indication of a head injury reportedly producing symptoms of headache and dizziness. The findings from the brain scan were unremarkable. During the period

2005 through 2014, items that stood out were pain complaints as a part of a general medical screening often around the range of moderate, or 4/10, on the severity scale. In this symptom checklist table, sinus problem, various aches and pains, headaches, lightheadedness, and frequent pain ratings of around 4/10 were the theme. In 2006, there was reference to chronic allergic rhinitis associated with a history of asthma. In 2008 there was more reference to headaches associated with sinus pain and chronic sinusitis. In 2009, there were symptoms of intermittent dizziness and shakiness along with lightheadedness that was unexplained by diagnostic tests. In 2014, the plaintiff was complaining of headaches occurring at a frequency of three times per week, which she felt was associated with stress. On that particular day, her pain rating was 6/10. Fioricet (often used for tension headaches) was tried as a treatment. A cardiac evaluation was completed in 2016 by Donald Sanders, M.D. for symptoms of chest pain, but the findings from the physical examination were unremarkable. Again in 2006, the plaintiff was seen at the Navy health clinic with severe headache complaints with a pain rating of 9/10.

**Review of records post-accident**

The first reference to the accident in question came from a police report where a vehicle apparently cut in front of the plaintiff resulting in a T-bone accident. She was in a Toyota Sienna van that sustained an estimated $1064.12 damage by one estimate. There was a second estimate for $2947.83. A picture of the car showed a small dent in the right front fender with that broken plastic headlight shield. There was an eyewitness account where it was reported, "the van went up in the air and came back down." The witness saw the other car drive off and chased the vehicle down to get the license plate number.

Apparently, the plaintiff refused EMS transport, but later in the day was taken to the Trident Hospital emergency room presenting at 7:19 PM. The chief complaint was left clavicle and shoulder pain. The pain was described as moderate. The patient "denied other symptoms." Back and neck pain were denied. The actual physical examination showed no trauma to the head. Basic mental status was normal. No altered mental status was observed. There was tenderness to the left clavicle and reduced range of motion to the left shoulder. Imaging of the shoulder was unrevealing. The diagnostic formulation was "contusion of the left clavicle." There were no signs or symptoms suggestive of a traumatic brain injury. There was no diagnosis of a concussion. Nursing notes showed the patient did not appear to be in distress. The overall pain rating was 6. BMI was calculated at 25.9. She was treated with Flexeril and Motrin.

Three days later the plaintiff again returned to the Trident ED on 11/1/2017 with new complaints of headache and neck pain. This time the pain location was head, neck, back, abdomen, right shoulder, and left shoulder. During this visit she denied hitting her head, denied loss of consciousness, and denied other symptoms at this time. The actual focused physical exam again revealed no trauma to the head, and no other abnormal findings except "tenderness over the left clavicle." A head CT was ordered and the findings were unremarkable. Abdominal and spinal CTs also were unremarkable. She was given Valium 10 mg. The primary target diagnosis was cervical strain. The secondary impression was lumbar strain, post-concussive headache.

There were two visits to the VA in late 2017. The first visit was on 10/31/2017. The plaintiff presented with subjective symptoms of severe pain thought to be muscle spasm. The pain was reported in the cervical muscles, bilateral trapezius, left shoulder, and low back. She was referred to Low Country Orthopedics. A second VA visit was dated 11/3/2017 with a chief complaint of headache pain rated 9/10. During this visit she reported new subjective symptoms of headache, blurry vision, mood changes, memory loss, and anxiety. She was attributing those symptoms to the motor vehicle accident. It was reported that her husband was out of town and she was complaining of "the worst headache of my life." Her neighbor had helped her go to the ER. As was previously noted, Valium was given at the ER that "took the edge off." In spite of her subjective complaints, the objective evaluation showed her neuropsychiatric status to be normal. The doctor at this visit did not seem to have reviewed any of the records, but independently diagnosed post-concussive syndrome presumably based on her subjective story. Amitriptyline was started, a muscle relaxant was started, Naprosyn was continued, and Percocet PRN was started. A referral was placed to neurology due to the severity of her complaints.

The plaintiff saw orthopedist Adam Schaff, M.D. where an MRI revealed tendinitis of the left shoulder without full thickness tendon tear. The right shoulder revealed a normal exam. She started in occupational therapy. Five visits were completed and she was discharged from the service because she was not attending scheduled appointments on 4/18/2019.

The first visit to neurology was with David Stickler's PA Lauren Barsan, PA on 11/10/2017. There were 17 visits to this practice during the time span 11/10/2017 through 12/3/2020. The initial referral was for post-concussion syndrome diagnosed by the VA doctor. The focus of the treatment was on the headaches. The plaintiff reported to this provider that she was involved in a motor vehicle accident on 10/29/2017 and was suffering from daily headaches, was having severe anxiety, and

was very emotional. Dizziness and poor balance were new symptoms that were reported to come and go. She also reported difficulty remembering things. Headaches were reported daily and were bilateral with the most severe pain being 5/10. Headaches were described to typically last all day. Triggers were loud noises or bright lights. Stress was later added to the list of the triggers. BMI with this first visit was 34.17. In actual examination, the plaintiff was cheerful throughout the visit. The mental status screening was normal. The entire neurological exam was unrevealing except for a positive Romberg. The diagnosis was post-concussive syndrome. In the records she was described as a stay-at-home mother of four and her husband worked out of state. The PA considered vestibular therapy and prescribed amitriptyline. An MRI of the brain and cervical spine was ordered.

The MRI of the brain was completed on 1/3/2019. The findings were negative except for low-lying cerebellar tonsils not meeting the criteria of Chiari I malformation. There was evidence of incidental sinus disease. Cervical CT was also negative.

The first follow-up visit was with Dr. Stickler on 12/26/2017. Dizziness, poor balance, confusion, insomnia, nightmares about the accident, and headaches all day long were reported. The plaintiff's husband accompanied her to the visit and told Dr. Stickler that his wife "**is an overly emotional person.**" Amitriptyline was refilled and Motrin, a muscle relaxer, and Zomig were prescribed. She was referred to psychiatry for her emotional issues.

In subsequent visits, treatment focused on headaches. The psychiatrist reportedly had stopped the amitriptyline and put her on Lexapro instead. With treatment, headaches were twice a week lasting about a day. Different medicines were tried. On 4/5/2018 it was described that the vestibular therapist had referred the plaintiff to vision therapy in spite of the normal neurological exams from Stickler's office. There were new complaints of double vision. Continued efforts to manage the headache were attempted. Dr. Stickler referred her to neuroophthalmology. Headaches fluctuated from a couple times a week to every day. On 9/18/2018 the plaintiff reported to the PA that she had seen an ophthalmologist and "did not receive the answers she wanted." It was recommended that she contact the VA for further psychological counseling. On 11/6/2018 she reported a severe headache where her eye bulged and was red.

On 1/8/2019 headaches were still occurring two times a week and triggered by stress or lights. It was reported that she was struggling with cognitive issues and having trouble getting words out. During this visit she was referred to neuropsychology.

On 6/10/2019, Dr. Wymer finished her neuropsychological report on the plaintiff. Dr. Wymer found no evidence of retrograde amnesia, noted purposeful behavior immediately after the accident when she exited the vehicle and called her husband, refusal to take EMS transport, and the severe headache previously noted on 10/31/2017 when she was out trick-or-treating with her children while her husband was out of town. Apparently, her husband was released home from active duty because of his wife's symptoms. It also was noted that there was a mental health visit on 11/2/2017 where PTSD was the rule out diagnosis and treatment was for anxiety and pain. It is reported that she saw somebody at Tri-County Behavioral Health, but did not have good rapport and failed to follow up.

The plaintiff reported that she had daily headaches typically two or three with a severe migraine once or twice a week at a pain level of 10. On effort testing the plaintiff failed the TOMM second trial and all three trials of the WMT. Dr. Wymer wrote, "Overall, performance validity testing indicates variable effort throughout the examination and renders neurocognitive desk test results as questionably valid." For cognitive screening, MMSE was 29/30, which is normal. In spite of memory complaints, in objective testing, delayed recall was a scale score of 11; on another test $T = 55$; and a final delayed visual memory test $T = 53$. With respect to memory complaints, language testing was normal and fluency was $T = 47$. The depression inventory was in the moderate severity range; anxiety score was elevated; and the Personality Assessment Inventory revealed disabling levels of anxiety, unusual concerns about physical functioning suggestive of a somatoform disorder, and her interpersonal style characterized as her being friendly and extroverted. Apparently, because of this accident her husband was no longer deployed.

Dr. Wymer opined that the main symptoms seemed to be psychological in nature and she diagnosed PTSD, major depressive disorder single episode, and noted the concussion, chronic daily headaches, and insomnia. She felt that she would benefit from mental health care.

On 6/28/2019 the plaintiff presented back to Dr. Stickler's office and wanted to go over the results from Dr. Levine [but I think this was a typo, meaning Dr. Wymer (or perhaps there was a report I did not have available for review)]. There was reference to the plaintiff's PCP referring her to Dr. Vandergriff for a second opinion regarding Chiari malformation. Vestibular therapy had ended and she reported, "It helped a lot." At this point in time, the term post-concussive syndrome was not used again by Dr. Stickler's practice. Ongoing visits continued for headache management. On 1/3/2020 migraines were now occurring only once every 3 to 4 weeks. **Cognitive delays were only reported during periods of intense migraine pain.** On

6

5/18/2020 stress seemed to be associated with COVID and having her children at home needing homeschooling. This was causing increased headaches. BMI had dropped to 26.61. On 6/29/2020, only one major migraine had occurred in 2 to 3 weeks. On 12/3/2020 she was no longer attending physical therapy and since this time she felt she was having increasing tension headaches.

There were records from Coosaw Eyecare that dated back to 6/15/2016 for routine eye exams for contact lens with optometrist Joel Schultz, OD. On 10/3/2017 (about 3 weeks before the accident in question), the plaintiff was seen for an eye exam with a chief complaint of eye irritation involving the right eye worse than the left. The irritation was associated with a corneal ulcer measuring 2mm with surrounding edema. This was thought to be related to contact lens use and was treated. On 4/2/2018 the plaintiff was again seen for routine eye exam, but was complaining of double vision that she attributed to the accident of 10/29/2017. She was referred to ophthalmologist Kerrison, "since the diplopia started after the car accident." She ultimately saw a specialist at Carolina Cataract & Laser Center 8/2/2019 who diagnosed corneal ulcer of the right eye and treated it with prednisone. It was recommended that she switch to daily disposable contacts. It was Drs. Baldwin and Neff's opinion that they did not think the ulcer was related to the accident in question. Later on, she had told another doctor that she was not happy with this opinion. There was also a visit to the ED at Trident for the same problem on 8/01/2019 for a "white hole" in the right eye. This was determined to be a corneal ulcer possibly related to contact lens and she was treated with medication.

Psychiatric notes beginning on 1/16/2018: During this visit the plaintiff presented to Dr. Pascale Mardikian, M.D. with the chief complaint of anxiety and insomnia, which she attributed to the motor vehicle accident in October. She reported to this doctor that she had "several bruises and her back was sore after the accident." Several days after the accident, she reported that she suddenly felt dizzy, nauseated, confused, and was slurring words. She told this doctor that she went to the ER and was diagnosed with a concussion. (In reality, she was taken to the hospital because "the most severe headache of my life.") It did not seem this doctor had reviewed any of her outside records and was only being provided the plaintiff's subjective symptoms. She reported being very frustrated and stressed because she was fighting with insurance issues and she had some hypervigilance around cars. The mental status exam was normal for cognition and she was diagnosed with new onset anxiety, distress and insomnia. She was referred to a therapist to improve coping skills. Amitriptyline was stopped and she was started on Lexapro and Restoril.

Curiously, 18 months transpired until the plaintiff was seen again. This doctor had scheduled a follow-up visit in four weeks or sooner as needed; however, 18 months had transpired before she was seen again. In any case, on 9/9/2019 she again presented after having not been seen for 18 months. She had not only been noncompliant with follow-up, but she also stopped the Lexapro shortly after it had been started without the advice of her doctor. She said that she had recent neuropsychological testing where she was diagnosed with PTSD, depression, and concussion/headache. In reference to the prior visit, there were new symptoms of memory issues that had not been reported previously to this doctor. This doctor diagnosed adjustment disorder with anxiety and started a sleep aid as well as restarting her on Lexapro as she had done 18 months earlier.

In a scheduled follow-up visit to the psychiatrist about 3+ months later, the plaintiff's mood had improved, and anxiety had diminished and observed that, "She still gets emotional at times, but she can handle it." She seemed to have benefited from the treatment. Ongoing visits chronicled her life with waxing and waning life stresses associated with her husband being in the health field and being exposed to COVID 19, worries about finances, hoping to have closure on the car accident, getting tense when driving near the intersection where the accident occurred, and homeschooling her kids because of COVID. On 6/2020 she was reporting that she was not feeling depressed and told this doctor that she felt she was "in a good place." She said that she had not felt well for a long time and no longer reported feeling foggy. She had increased energy and motivation. She was not feeling overwhelmed. Then, a couple months later her 15-year-old dog had died. Around the time she said, "My anxiety has been through the roof again." Apparently, the defendant from the car accident had been found and she was reliving everything. This was causing her to be distracted, forgetting things, and causing brain fog. Ultimately, a few months later the symptoms again subsided. She was feeling much better when her children finally got back in school on 3/3/2021, but was worrying about her legal case.

In a separate set of notes the plaintiff had seen Alex Vandergriff, M.D. on 4/17/2019. She reported to him that she would get double vision especially when reading something very close to her face. She was reporting occasional migraines roughly 2 or three times a week. In the exam his findings were negative for attention, orientation, language, memory, and the basic neurologic exam was negative. He reviewed the MRI and felt she had mild Chiari malformation. He said that some of the symptoms did not match symptoms of Chiari and was probably related to her migraines. He felt he could do a decompression surgery, but warned that the procedure might not alleviate all of her symptoms. She wanted to consider this further.

8

As noted above, within the records there was no evidence of physical damage to the brain based on a CT from 11/1/2017 and a MRI from 1/3/2019, except the "slightly low-lying cerebellar tonsils without meeting criteria for Chiari I malformation."

**Opinions:**

1.) **Ms. Tara Farque did not suffer a traumatic brain injury associated with the 10/29/2017 motor vehicle accident.**

Evidence to support this opinion surrounds the question of what constitutes a brain injury. Specifically, how does the clinician distinguish between minor blows to the head versus a blow to the head that causes brain damage? There are numerous well-established national and international consensus guidelines to help answer these questions that I will briefly review.

Professional consensus guidelines on the topic of diagnosing a brain injury come from organizations such as Psychiatry as outlined in the Diagnostic and Statistical Manual-IV, National Academy of Neuropsychology (Ruff, et al., 2009), American Academy of Neurology Practice Parameter (1997), Mayo Head Injury Classification System (Malec, et al., 2007), American Congress of Rehabilitation Medicine (1993; 2021), AMA Guides 5th and 6th editions; Center for Disease Control, Center for Disease Control and Prevention (2007), Department of Defense, Report to Congress on Traumatic Brain Injury in the US by the CDC, NIH, DoD and VA (2008; 2013), etc.

Central to any consensus standard that defines a brain injury, the blow to the head has to be of sufficient force as to result in an alteration in brain function. The functional consequences of a traumatic brain injury range from transient, reversible alteration in brain function such as a minor concussion to profound permanent disability or death.

One major benchmark for grading the severity of a brain injury is loss of consciousness. Immediately after the insult to the brain, the duration of unconsciousness (if any) is highly predictive of eventual outcome. Unresponsiveness associated with loss of consciousness for up to 30 minutes is defined as a "mild" traumatic brain injury. Mild traumatic brain injury is associated with an excellent prognosis for relatively swift and complete recovery to normal baseline function. Loss of consciousness greater than 30 minutes to less than 24 hours constitutes "moderate" traumatic brain injury and carries with

it a guarded prognosis. Recovery time is much more prolonged and there is a risk for permanent residual functional consequences. "Severe" traumatic brain injury is defined as loss of consciousness greater than 24 hours and carries with it a negative prognosis with a risk of death, a permanent neurovegetative state, or permanent cognitive impairment likely to result in significant functional consequences associated with daily living (see Table 1). **Ms. Farque had no loss of consciousness associated with the accident of 10/29/2017.**

Another major clinical benchmark highly predictive of eventual outcome is the initial depth of coma. The initial Glasgow Coma Scale (GCS) score is a marker as to the degree of initial brain damage. This scale measures depth of coma on a 15-point scale and is highly predictive of eventual outcome. A GCS of 15 to 13 is considered "mild" brain damage and has an excellent prognosis for relatively swift and complete recovery of function back to baseline. A GCS of 13 to 9 is "moderate" brain damage and conveys a prognosis of slower and possibly incomplete recovery back to baseline. A GCS of 8 to 3 is a "severe" brain injury with a highly guarded prognosis heightened risk of death (see Table 1). Ms. Farque refused EMS transport to the ED, and presented to the ED on her own later that day. Ms. Farque had a GCS measured at the ED as 15/15.

Associated with an impaired GCS is a clinical marker called "post-traumatic amnesia" (PTA). During PTA, individuals may be awake and talking, but are confused and will not recall anything that transpires for a period of time. As individuals emerge out of PTA, they will report "waking up" and will then have continuous memory of events that transpire. PTA is graded as "mild" signs of brain damage if impaired consolidation of new memories lasts for up to one day. "Moderate" brain damage is PTA from greater than 1 day to less than 7 days. "Severe" brain damage is associated with PTA for greater than 7 days. Each level conveys a prognosis as above (see Table 1). PTA requires loss of consciousness or acute onset extreme mental confusion. **Ms. Farque did not experience PTA associated with the accident of 10/29/2017.**

Lastly, structural imaging of the brain is a prognostic indicator. With "mild" brain damage, most often CT and/or MRI findings are negative for injury to the brain. That finding usually carries with it a prognosis for swift and complete recovery. In moderately severe and severe brain damage, there are often positive findings on brain imaging such as diffuse micro-hemorrhagic change, axonal shearing, and/or subdural hematoma. Positive findings on brain imaging often result in permanent degrees of cognitive change (see Table 1). **Ms. Farque's**

**brain CT and later MRI were negative for any physical damage to the brain associated with the accident of 10/29/2017.**

In addition, when there is no loss of consciousness resulting in coma or a GCS of 13 or 14, many healthcare providers also assess for acute mental status change in examination noting signs of confusion, disorientation, or loss of memory for the events immediately before or after the injury as a potential marker of something more significant that a non-neurologically related blow to the head. Alteration of consciousness that is momentary lasting up to 24 hours is most often seen in "mild" traumatic brain injury. Alteration in consciousness greater than 24 hours is seen in "moderate" and "severe" traumatic brain injury (see Table 1). **Ms. Farque had no acute alteration in consciousness associated with the accident of 10/29/2017.**

All of the above markers of brain damage are intercorrelated. The degree of initial injury is highly predictive of rate of recovery and ultimate prognosis. As a rule, the less severe the injury, the better, faster and more complete the recovery, and vice versa.

**Table 1-Severity of Brain Injury Stratification**

| Mild | Moderate | Severe |
|---|---|---|
| Normal structural imaging | Normal or abnormal structural imaging | Normal or abnormal structural imaging |
| LOC=0–30 minutes | LOC > 30 minutes and < 24 hours | LOC > 24 hours |
| AOC=a moment up to 24 hours | AOC > 24 hours. Severity based on other criteria | |
| PTA=0–1 day | PTA > 1 and < 7 days | PTA > 7 days |
| GCS=13–15 | GCS=9–12 | GCS=3–8 |

*Note: AOC=alteration of consciousness/mental state; LOC=loss of consciousness; PTA=posttraumatic amnesia; GCS=Glasgow Coma Scale. For purposes of injury stratification, the Glasgow Coma Scale is measured at or after 24 hours. This stratification does not apply to penetrating brain injuries where the dura mater is breached. For purposes of injury stratification, the Glasgow Coma Scale (GCS) is measured at or after 24 hours (Malec et al. 2007; Esselman and Uomoto 1995; American Congress of Rehabilitation Medicine, 1993; Saatman et al. 2008; Model System). Source: Department of Defense and Department of Veterans Affairs.*

Residual symptomatology from a serious brain injury is a clinical syndrome called post-concussive syndrome (PCS). Diagnostic criteria of PCS were first proposed in 1992 in the International Classification of Diseases, Tenth Revision (ICD-10), which included clinical and research criteria sets for PCS. The ICD-10 clinical criteria require a history of TBI and the presence of three or more of the following eight symptoms: 1) headache, 2) dizziness, 3) fatigue, 4) irritability, 5) insomnia, 6) concentration; 7) memory difficulty, and 8) intolerance of stress, emotion, or alcohol.

During preparation of the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV), the diagnosis of post-concussive disorder was proposed. Criteria for this diagnosis were published in modified form in a DSM-IV appendix of provisional criteria sets designated as needing further research. DSM-IV criteria are: A) history of TBI causing "significant cerebral concussion;" B) cognitive deficit in attention and/or memory; C) presence of at least three of eight symptoms (e.g., fatigue, sleep disturbance, headache, dizziness, irritability, affective disturbance, personality change, apathy) that appear after injury and persist for 3 months; D) symptoms that begin or worsen after injury; E) interference with social role functioning; and F) exclusion of dementia due to head trauma and other disorders that better account for the symptoms. Criteria C and D set a symptom threshold that requires symptom onset or worsening to be contiguous to the injury, distinguishable from pre-existing symptoms, and have a minimum duration. The ICD-10 criteria would be more inclusive than DSM-IV criteria, but both ICD-10 and DSM-IV criteria would be fulfilled more often by patients with brain injury than by those with extracranial trauma, and the DSM-IV criteria would have greater specificity to TBI. In order to have PCS, there must be the presence of a significant cerebral injury. There is no recognized diagnostic criterion where the reverse reasoning applies. That is to say, the presence of PCS is not sufficient to diagnose a traumatic brain injury. **Ms. Farque reports**

**a lot of subjective symptoms, but does not meet criteria for PCS based on the fact that she did not suffer a blow to the head of sufficient force as to result in an alteration in brain function.**

There has been a great deal of research on PCS. The findings have consistently shown that, in isolation, PCS is not a useful syndrome for identifying a traumatic brain injury. In particular, researchers have found that 3 of 4 healthy adults reported experiencing three or more symptoms of PCS at mild or greater severity (Iverson & Lange, 2003). Other studies have shown that pre-injury depression, stress or anxieties are better predictors of long-term PCS than is a mild traumatic brain injury.

2.) **It is my opinion that Ms. Farque's subjective complaints that seem to be post-concussive syndrome-like are actually most probably pre-existing psychological and other somatic symptoms.**

Ms. Farque has a pre-existing history of mild Chiari I formation. There is nothing in the records that incident of 10/29/2017 caused acute or chronic aggravation of this condition. Dr. Vandergrift felt that the pre-existing Chiari 1 could be contributory to her headaches and he has offered decompression surgery to possibly help alleviate at least some of her headache symptoms. He noted a lot of her symptoms did not match up with Chiari I and warned that the procedure might not alleviate her symptoms. She also a long history of chronic migraines that date back to at least 2005. There are many aches and pains dating back to at least 2005 with pain severity often rated around 4/10. Somatic (or hypochondriac) tendencies are noted with a long list of diagnoses listed in the VA records for the plaintiff who otherwise is relatively healthy. Further, in the personality profile administered by Dr. Wymer, the psychological finding showed her "to be experiencing an unusual degree of concern about physical functioning and health matters and probable impairment arising from somatic symptoms. This pattern of symptoms is often consistent with somatization disorder." While Ms. Farque does not have a known psychiatric history, she does self-report claustrophobia pre-accident on a questionnaire and her husband did describe her as "an overly emotional person." Finally, it was observed by her psychiatrist that during times of stress there would be many cognitive complaints that seem post-concussion-like, but these symptoms abated when not feeling stressed. This waxing/waning pattern of post-concussive-like symptoms are highly typical of psychological stress and not consistent with organically mediated post-concussive symptoms following a significant cerebral injury to the brain.

4. The facts or data considered forming my opinions are contained in what I understand to be the complete set of medical records in this case. Records that I reviewed are outlined in the attachment. Scientific references cited are in the attachment entitled "Scientific References Cited."

5. My qualifications are in my attached CV.

6. Cases where I have testified as an expert at trial or by deposition are in the attachment and I believe this to be a relatively complete list.

7. My fee schedule for forensic work is at the rate of $375/hour for reviewing records and writing opinions, and $600 for testimony. As of 8/23/2021, my cumulative charges on this case are $5025.00.

Respectfully submitted,

Mark Wagner, Ph.D.
Professor of Neurology
Medical University of South Carolina

14

## Scientific References Cited

ICD-10 World Health Organization. International statistical classification of disease and related health problems. 10th ed. Geneva, Switz: World Health Organization; 1992.

Centers for Disease Control and Prevention. Heads up. Facts for physicians about mild traumatic brain injury (MTBI) Atlanta, GA: Centers for Disease Control and Prevention; 2007.

*Diagnostic and Statistical Manual of Mental Disorders*, 5th edition, diagnostic criteria for post-concussional disorder. American Psychiatric Association Diagnostic and statistical manual of mental disorders. 5th ed. Washington, DC: American Psychiatric Association.

Diagnostic criteria for mild traumatic brain injury from the American Congress of Rehabilitation Medicine. Mild Traumatic Brain Injury Committee Definition of mild traumatic brain injury. J Head Trauma Rehabil. 1993;8(3):86–7.

Defense and Veterans Brain Injury Center Updated mTBI clinical guidance. Washington, DC: Defense and Veterans Brain Injury Center; 2008.

Practice Parameter: The management of concussion in sports (summary statement). Neurology, 1997; 48: 581-585.

Ruff, et al. (2009). Recommendations for diagnosing a mild traumatic brain injury: A National Academy of Neuropsychology Education Paper. Archives of Clinical Neuropsychology, 24: 3-

AMA and Rondinelli (2009). AMA Guides to the Evaluation of Permanent Impairment, 6th Edition.

Malec JF, Brown AW, Leibson CL, Flaada JT, Mandrekar JN, Diehl NN, Perkins PK. The mayo classification system for traumatic brain injury severity. J Neurotrauma. 2007 Sep;24(9):1417-24.

Silverberg ND, Iverson GL; ACRM Mild TBI Definition Expert Consensus Group and the ACRM Brain Injury Special Interest Group Mild TBI Task Force. Expert Panel Survey to Update the American Congress of Rehabilitation Medicine

Definition of Mild Traumatic Brain Injury. Arch Phys Med Rehabil. 2021 Jan;102(1):76-86.

Centers for Disease Control and Prevention. (2015). Report to Congress on Traumatic Brain Injury in the United States: Epidemiology and Rehabilitation. National Center for Injury Prevention and Control; Division of Unintentional Injury Prevention. Atlanta, GA.